FILED - GR
May 5, 2008 2:09 PM
RONALD C. WESTON, SR., CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: mrs /

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Three Angels Broadcasting Network, Inc., an Illinois non-profit corporation, and Danny Lee Shelton, individually,<br><br>　　　　　　　　　Plaintiffs,<br><br>v.<br><br>Gailon Arthur Joy and Robert Pickle,<br><br>　　　　　　　　　Defendants. | 1:08-mc-3<br>Richard Alan Enslen<br>Senior, US District Judge |

## DEFENDANT ROBERT PICKLE'S MEMORANDUM IN SUPPORT OF HIS MOTION TO COMPEL REMNANT PUBLICATIONS

### INTRODUCTION

Three Angels Broadcasting Network, Inc. (hereafter "3ABN") and Danny Lee Shelton (hereafter "Plaintiff Shelton") filed suit on April 6, 2007, in United States District Court for the District of Massachusetts, a suit captioned *Three Angels Broadcasting Network, Inc. and Danny Lee Shelton v. Gailon Arthur Joy and Robert Pickle* (No. 07-40098-FDS (D. Mass.)). See Affidavit of Robert Pickle (hereafter "Pickle Aff."), Ex. A.

The Defendants seek relevant documents by subpoena from Remnant Publications (hereafter "Remnant") of Coldwater, Michigan, pertaining to a) royalty or other payments made directly or indirectly to Plaintiff Shelton, b) the flow of money or assets from 3ABN through Remnant to Plaintiff Shelton, his relatives, or 3ABN officers, directors, or employees, c) the underlying agreements which establish or define the relationships and payments between Remnant and the Plaintiffs, and d) the manuscripts or books Remnant publishes or prints for the

1

Plaintiffs. See Pickle Aff., Ex. B. Remnant refuses to comply with the subpoena, will not produce a single document without the granting of a motion to compel, and did not show up at the scheduled time for inspection and copying. See Pickle Aff., Ex. C–E.

## STATEMENT OF RELEVANT FACTS

### *Background*

Both 3ABN and Remnant are publicly supported, non-profit, 501(c)3 corporations which file Form 990's with the Internal Revenue Service annually. See Pickle Aff. at ¶¶ 4, 12. Remnant has performed printing and publishing services for the Plaintiffs, and, due to Remnant having a seat or seats on 3ABN's book committee, is in alliance with 3ABN in regards to the Plaintiffs' publishing ventures. See Pickle Aff., Ex. F.

The U.S. Congress requires that Form 990's be open to public inspection, thus making 3ABN and Remnant to a degree accountable to the public from which they solicit support. Both 3ABN and Remnant are supporting ministries of the Seventh-day Adventist Church.

From 1985 until September 2007, Plaintiff Shelton was the president, CEO, and managing director of 3ABN, and he remains an influential director of and the only founder still employed by 3ABN.

Plaintiff Shelton has been the subject of numerous and varied allegations of malfeasance and misconduct, as well as negative internet commentary, long before either Defendant became involved in mid-August 2006. These allegations have included wrongful termination, sexual assault, the ignoring or cover up of child molestation allegations, unbiblical divorce, deceit, private inurement, and conflict of interest.

In June of 2004 Plaintiff Shelton divorced his then wife Linda Shelton in Guam, though both were residents of Illinois. Their marital property remains undivided. See the open case filed in 2005, *In Re: The Marriage of Linda Sue Shelton vs. Danny Lee Shelton*, IL Franklin County

2

(2nd). In a July 2006 financial affidavit filed in these divorce proceedings, Plaintiff Shelton reported no other income than his 3ABN salary. See Pickle Aff., Ex. G.

In mid-August 2006 the Defendants, both members of the Seventh-day Adventist Church, launched ecclesiastical investigations into the conduct of Plaintiff Shelton, and began publishing investigative reports in harmony with their First Amendment rights of Freedom of the Press, Freedom of Speech, and Freedom of Religion. The Plaintiffs repeatedly claimed to have evidence to prove various allegations false while also refusing to provide that evidence to inquirers.

The Plaintiffs filed suit on April 6, 2007, charging the Defendants in court filings with causing 3ABN's donations to decline. See Pickle Aff., Ex. A at ¶ 78. A confidentiality order in the underlying case was issued by Magistrate Judge Timothy Hillman on April 17, 2008. See Pickle Aff., Ex. H.

### *The Allegations of the Plaintiffs in Their Complaint*

Regarding financial matters, the complaint of the underlying suit accuses the Defendants of accusing Plaintiff Shelton or 3ABN Board members of personally enriching themselves in violation of the Internal Revenue Code. See Pickle Aff., Ex. A at ¶ 46g. It specifically alludes to allegations concerning royalties that Remnant paid Plaintiff Shelton, that Plaintiff Shelton did not disclose to the 3ABN Board, and that Plaintiff Shelton did not disclose on his July 2006 financial affidavit. See Pickle Aff., Ex. A at ¶¶ 46h, 50i.

The underlying suit uses its allegations of violations of the Internal Revenue Code and failure to disclose in the financial affidavit as grounds for its claim of defamation *per se*, thus transferring the burden of proof to some extent to the Defendants. See Pickle Aff., Ex. A at ¶ 75.

### *Plaintiff Shelton's Publishing Ventures*

Rather than allowing 3ABN to make a publisher's profit, Plaintiff Shelton instead maximized his own personal profits by using his DBA, D & L Publishing, to sell tens of

3

thousands of dollars of books to 3ABN, even though 3ABN revenue can't inure to the benefit of any private person. See Pickle Aff. at ¶ 8. After his divorce, Plaintiff Shelton used DLS Publishing in this same way. Id.

Table 1 lists the purchases attributable to Plaintiff Shelton's books or products for the years 2001 through 2006 as derived from 3ABN's financial statements available from the Illinois Attorney General's office. See Pickle Aff., Ex. I–N at Note 14. None of these purchases were similarly disclosed on 3ABN's Form 990's.

**TABLE 1: 3ABN's Purchases of Shelton's Products**
(Data from Note 14 of 3ABN's Financial Statements)

| Year | Vendor | Reported Total |
|---|---|---|
| 2001 | Owned by Two Board Members | $75,000 |
| 2002 | D & L | $130,612.50 |
| 2003 | D & L | $73,112.50 |
| 2004 | D & L | $35,000 |
| 2004 | DLS | $44,724.38 |
| 2005 | Unspecified | $82,712.43 |
| 2006 | Unspecified | $2,982,793.71 |
| **Total Purchases** | | **$3,423,955.52** |

A January 2004 decision against 3ABN in 3ABN's Illinois property tax case suggests that Plaintiff Shelton needed to avoid earning royalties from sales connected to his 3ABN activities, and raised questions about whether 3ABN engaged in charity by giving product away, or whether it instead sold books and videos with a view to profit. See Pickle Aff., Ex. O. The decision also noted that 3ABN could not document items that it had given away. See Pickle Aff., Ex. O at ¶ 77. Whereas 3ABN had before this decision reported sales of books as gross sales of inventory offset by cost of goods sold, from 2004 onward it reported such sales as contributions and cost of goods given away, thus concealing the nature of the sales and generating the formerly missing record of

4

items given away. See Pickle Aff., Ex. K, revenue of "Other sales" on p. 4, expense of "Cost of goods sold or given away - Other" on p. 12; Ex. L, no revenue attributable to "Other sales" on p. 4, expense of "Cost of goods given away - Other" on p. 12.

That the Sheltons were authoring or publishing books prior to 2001 is clear from the advertisement 3ABN carried on its website in 1998 for *Especially for You*. See Ex. P.

### *The 2006 Book Campaign*

In the first half of 2006, 3ABN heavily marketed Plaintiff Shelton's book, *The Ten Commandments Twice Removed* ("*TCTR*"), and distributed 4.8 million copies in exchange for 25 cents a book for shipping, suggesting that 3ABN took in $1.2 million dollars to cover the cost of shipping. 3ABN took orders and payment, and Remnant handled the publishing, printing, and fulfillment. See Pickle Aff. at ¶ 10. Plaintiff Danny Shelton reported no income attributable to this enormous volume of sales in his July 2006 financial affidavit. See Pickle Aff., Ex. G.

Tables 2 and 3 give figures from 3ABN and Remnant's 990's, from which may be derived approximate figures for the royalties Plaintiff Shelton received for the 2006 *TCTR* campaign, the cost to 3ABN for 4.8 million *TCTR* books, 3ABN's resulting loss for the year, and Remnant's resulting gain. See Pickle Aff., Ex. M–N, Y–Z.

**TABLE 2: 3ABN: Comparison Between 2005 and 2006**
(Data from Form 990, Lns. 1, 12, Statement 2)

|  | 2005 | 2006 | Inc (Dec) |
|---|---|---|---|
| **Cost of Goods** | $605,744 | $3,167,235 | $2,561,491 |
| **Contributions** | $14,060,275 | $15,075,120 | $1,014,845 |
| **Total Revenue** | $14,956,597 | $16,602,282 | $1,645,685 |
| **Net Gain (Loss)** | ($482,493) | ($2,996,016) | ($2,513,523) |

A careful analysis of tables 2 and 3 takes note that a) the figures by which 3ABN's cost of goods and Remnant's sales of literature increased are roughly the same, b) the approximate

amount of royalties Plaintiff Shelton earned are represented by the increase in Remnant's royalty expense, and c) 3ABN's losses in 2006 may have been attributable to the pricing structure for *TCTR*, 3ABN's payments to Remnant, and Remnant's royalty payments to Plaintiff Shelton instead of a decline of donations due to Defendants' investigative reporting.

**TABLE 3: Remnant: Comparison Between 2005 and 2006**
(Data from Form 990, Lns. 35, 38, 43, 93)

|  | 2005 | 2006 | Inc (Dec) |
|---|---|---|---|
| **Literature Sales** | $1,228,662 | $4,316,011 | $3,087,349 |
| **Royalties Paid** | $116,556 | $508,767 | $392,211 |
| **Printing** | $445,558 | $1,680,814 | $1,235,256 |
| **Shipping** | $112,769 | $394,640 | $281,871 |
| **Net Gain (Loss)** | ($162,212) | $601,501 | $763,713 |

According to Remnant's Form 990 filings, its officers and directors consist of Dwight Hall (president), his two brothers Dan Hall and Rudy Hall, and his father Darwin Hall. See Pickle Aff., Ex. S–Z at Part V. Remnant's reported 2006 gain might have been higher had it not been for an increase in two other expenses attributable to increased payments for occupancy and travel. See Table 4.

**TABLE 4: Remnant: Occupancy and Travel Costs**
(Data from Form 990, Lns. 36, 39, 43)

| Year | Occupancy | Utilities | Travel |
|---|---|---|---|
| 1999 | $400 | $9,931 | $5,925 |
| 2000 |  | $26,119 | $6,199 |
| 2001 |  | $23,303 | $15,440 |
| 2002 | $72,792 |  | $17,460 |
| 2003 | $74,879 |  | $27,521 |
| 2004 | $60,000 |  | $61,462 |
| 2005 | $96,500 |  | $103,547 |
| 2006 | $120,000 |  | $148,964 |

6

### *Sources Confirm Hiding of Remnant Royalties*

Former general counsel and director of 3ABN, Nicholas Miller, claimed in September 2006 that he was "quite certain" that Plaintiff Shelton had earned "several hundred thousands of dollars" from *TCTR*, but that he was hiding the amount from his board members, that this was a "gross conflict of interest," and that this could cost 3ABN its tax exempt status. See Pickle Aff., Ex. AA. Miller's later story about Plaintiff Shelton's channeling monies from 3ABN to his future wife through a third-party non-profit suggest the creative lengths Plaintiff Shelton might go to hide the method of his obtaining his royalties. See Pickle Aff. at ¶ 12.

In November 2006, Plaintiff Shelton stated that he was refusing to disclose his royalties until after his marital property case with Linda Shelton was settled. See Pickle Aff., Ex. BB at p. 5.

In early 2007 sources informed the Defendants that Plaintiff Shelton and Dwight Hall had conspired to hide Plaintiff Shelton's royalties from the 3ABN Board, and from his ex-wife Linda Shelton, whom Plaintiff Shelton believed was entitled to some of the royalties. According to these sources, the money sat on Remnant's books and was secreted in an account in a Coldwater, Michigan, bank. See Affidavit of Gailon Arthur Joy. Allegations also surfaced that Dwight Hall was supplementing his Remnant salary by payments made by Remnant to Hall-controlled companies for building and aircraft leases. See Pickle Aff. at ¶ 15.

After publishing editions of *TCTR* claiming to have been copyrighted in 2005 by Danny Shelton and Shelley Quinn and carrying publication dates of 2005 and 2006, Remnant published yet another edition in 2007. This 2007 edition, contrary to industry standards, carried the same ISBN number as the previous editions, and claimed instead to have been copyrighted only in 2005 by only Remnant. See Pickle Aff. at ¶¶ 16–17, Ex. W–Y. This false copyright claim in 2007 after 5 million copies of the previous editions had already been distributed suggests that Dwight

7

Hall and Remnant are willing to go to extreme lengths to aid Plaintiff Shelton in concealing his ownership of the rights to *TCTR* as well as his royalties.

## ARGUMENT

### I.  THE WESTERN DISTRICT OF MICHIGAN IS THE CORRECT COURT

Remnant's counsel refers to the Federal Rules and complains that "it is a waste of judicial resources and contemptible" for the Defendants to have served Remnant with the instant subpoena from the Western District of Michigan after having already served Remnant with a subpoena from the District of Massachusetts. See Pickle Aff., Ex. B. Yet Fed. R. Civ. P. 45(a)(2)(C) requires that the subpoena be issued from the Western District of Michigan, since that is where the requested production of documents is to take place.

### II.  THE SUBPEONA IS NOT BURDENSOME

#### A.  Production of an "Enormous Volume of Paper" Not Required

Remnant's counsel contends that the subpoena is burdensome because it requires "producing this enormous volume of paper." And yet the Defendants' cover letter to Dan Hall explicitly stated:

> To avoid any expense to Remnant, unless you have another suggestion, we would plan on providing our own equipment to copy the requested materials, and would do our own copying. We would need at your earliest convenience the types of materials we are talking about so that we can make sure we have the right equipment and blank media.

Remnant's counsel's contention assumes that some of the information sought is in electronic form and must be converted to paper, while the Defendants express their willingness to use whatever media and/or equipment is necessary to copy the information in whatever form it happens to be in, all at their own expense. The Defendants assume that some of the information sought is in electronic form and that it will not have to be converted to paper.

#### B.  Locating Requested Documents Not "Time Consuming"

8

Remnant's counsel contends that searching for the documents will be time consuming. However, regarding electronically stored information, it is a relatively easy task to isolate relevant emails, word processing documents, and desk-top-publishing documents using various search tools. The located documents can then be burned to a CD or DVD rather quickly.

Regarding paper documents, publishers and printers must routinely organize and keep track of manuscripts and correspondence in order to properly service clients and customers. Retrieval of relevant, extant paper documents should be able to be done in short order, provided that Remnant operates its business like a typical publisher or printer.

## III. THE SUBPEONA IS NOT OVERBROAD

### A. Limited in Scope to Documents Pertaining to the Plaintiffs

Remnant's counsel complains that the subpoena seeks documents from too many corporations and individuals. Yet D.MA Loc. R. Civ. P. 26.5 ("Uniform Definitions in Discovery Requests") states:

> (5) *Parties.* The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

Thus the Defendants' request for documents is fully in line with the local rules of the district in which the case is venued.

Plaintiff Shelton acknowledged trying to hide his royalties. Credible sources allege that Dwight Hall conspired with Plaintiff Shelton to assist him in doing so. Thus, Defendants must explore whether royalties attributable to Plaintiff Shelton's books were channeled by Remnant through Plaintiff Shelton's relatives, or individuals or entities associated with the Plaintiffs.

Remnant is not a massive corporation which has no idea what entities or individuals associated with the Plaintiffs it has done business with. It is a relatively simple matter for it to determine who it needs to seek documents for. Furthermore, the Defendants have limited their

9

requests to only those documents pertaining to entities or individuals Remnant already believes or knows to be associated with the Plaintiffs.

### B. Limited in Scope to the Less Than the Presently Documented Time Period of Plaintiff Shelton's Publishing Ventures

According to 3ABN's advertisements and tax return filings, the Sheltons have been authoring or printing books since at least 1998, though the Plaintiffs' utilization of Remnant may have begun later. Accordingly, the Defendants limit their request for documents from Remnant to a time period commencing on January 1, 2000, or commencing from when Remnant first started providing printing or publishing services for Plaintiff Shelton or the stated entities, whichever commencement date is later.

Given the fact that Remnant and 3ABN have both creatively channeled part of their revenue to their officers or directors even prior to the 2006 *TCTR* campaign, the Defendants have a basis for discovering whether 3ABN or Plaintiff Shelton used Remnant as such a conduit for private inurement at any point in time after the appropriate commencement date.

### IV. THE DOCUMENTS SOUGHT ARE RELEVANT

Remnant's counsel claims that the documents sought are not relevant to the allegations of the underlying suit. Yet the underlying complaint refers to allegations concerning a) Remnant's royalty payments to Plaintiff Shelton, b) those royalties being concealed, and c) other 3ABN personnel similarly enriching themselves. Accordingly, Defendants seek to inspect and copy documents pertaining to these individuals from Remnant: a) documents pertaining to royalties, b) manuscripts and works for which royalties would be earned, c) records of payments made and received, d) records and bank statements pertaining to monies held, and e) the underlying contracts and agreements which establish relationships between Remnant and the Plaintiffs.

### V. A CONFIDENTIALITY ORDER IS IN PLACE

Lastly, Remnant's counsel expresses the need of having a protective order. A

confidentiality order has now been handed down, and Remnant can avail itself of the terms of that order if it so chooses. If Remnant wishes a protective order of a different sort, they have certainly not sought one from the court, even though they have had plenty of time to do so.

## VI. REMNANT FAILED TO FILE A TIMELY MOTION

Fed. R. Civ. P. 45(c)(3)(A) explicitly allows an entity or individual subject to a subpoena to seek relief "on timely motion" if the subpoena "requires disclosure of privileged or other protected matter, if no exception or waiver applies," or if the subpoena "subjects a person to undue burden." Remnant failed to file a motion by April 15, 2008, the date of production on the subpoena, and thus failed to file a timely motion. Remnant therefore cannot obtain relief by way of Fed. R. Civ. P. 45(c)(3)(A).

Besides the subpoena not being unduly burdensome, it must be noted that the Plaintiffs waived claims of privilege regarding publishing contracts or payments to or from Remnant when they put at issue in the controversy the matter of Plaintiff Shelton's royalties from Remnant.

## CONCLUSION

Allegations in the Plaintiffs' complaint in the underlying suit, statements by the 3ABN Board chairman, sources, and public documents all provide a basis for the requests in the Defendants' subpoena. Accordingly, their subpoena is not only not burdensome or overbroad, but its requests are relevant and reasonably calculated to result in admissible evidence, thus falling within the scope of Fed. R. Civ. P. 26(b)(1). Furthermore, the Defendants made it quite clear that they intended to cover all copying costs, and the Plaintiffs waived potential claims of privilege by placing Remnant's royalty payments to Plaintiff Shelton at issue in the underlying suit.

Remnant's refusal to produce a single document without a motion to compel is therefore entirely unreasonable. The Defendants consequently seek the granting of their motion to compel, and, pursuant to Fed. R. Civ. P. 37(a)(5)(A), their reasonable expenses in bringing this motion

before the Court.

Respectfully submitted,

Dated: May 1, 2008

*[signature: Bob Pickle]*

Robert Pickle, *pro se*
1354 County Highway 21
Halstad, MN 56548
Tel: (218) 456-2568